Lawrence J. King, Esq., #120805
LAW OFFICES OF LAWRENCE J. KING
11 Western Avenue
Petaluma, CA 94952
Telephone: 707-769-9791
Fax: 707-769-9253
Email: kingesq@pacbell.net

Attorneys for Plaintiff Amber Moreno

## UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF CALIFORNIA
### FRESNO DIVISION

| | |
|---|---|
| AMBER MORENO,<br><br>                      Plaintiff,<br><br>v.<br><br><br>CITY OF PORTERVILEE, MICHAEL BENAS, MARK AZEVEDO, GARY MILLER, RICHARD STANDRIDGE, and JAKE CASTELLOW,<br><br>                    Defendants. | CASE NO.<br><br>**PLAINTIFF'S COMPLAINT FOR**<br>**(1) SEX DISCRIMINATION IN VIOLATION OF TITLE VII ,**<br>**(2) RETALIATION IN VIOLATION OF TITLE VII,**<br>**(3) DEPRIVATION OF CIVIL RIGHTS IN VIOLATIONS OF 42 U.S.C SECTION 1983;**<br>**(4) SEX DISCRIMINATION IN VIOLATION OF THE FEHA ,**<br>**(5) RETALIATION IN VIOLATION OF THE FEHA, AND**<br>**(6) WHISTLEBLOWER RETALIATION IN VIOLATION OF LABOR CODE SECTION 1102.5**<br><br>**AND**<br><br>**PLAINTIFF'S DEMAND FOR A JURY TRIAL.**<br><br>**UNLIMITED CIVIL ACTION.** |

     NOW COMES PLAINTIFF **AMBER MORENO,** and files this her complaint, demanding a jury trial and alleging the following:

1

## INTRODUCTION

1. The Porterville Police Department has a problem. Its male leadership has yet to absorb the lessons of the "Me Too Movement" and to comply with California and Federal law prohibiting discrimination against its female officers. Now it is poised to appoint as the Chief of the Porterville Police Department a Captain who threatened and intimidated the victims of sex harassment and protected the harassers.

2. Plaintiff Amber Moreno joined the Porterville Police Department in March of 2011, determined to prove that she could be as good a police officer as any man on the force. To do so, she endured sexist, misogynist, and homophobic comments by her fellow officers and superiors. To do so, she had to persevere in the face of a culture of sex discrimination, but she did so. Ultimately though, when she stood up for the newer, younger, female officers and reported the sex harassment to which they were being subjected, Plaintiff became the target of a virulent campaign of retaliation that was intended to, and did, force her to abandon the career for which she had fought so hard.

3. Plaintiff brings this suit to vindicate her right, and the right of all California employees the right to work in an environment free from discrimination and to report what an employee reasonably believes is a violation of law or regulation, without being retaliated against for doing so. The essence of Plaintiff's claims is that: (1) she was discriminated against on the basis of her gender and her sexual orientation and (2) she was retaliated against because she reported the discrimination to which she and other female employees were subjected.

## PARTIES AND VENUE

4. Plaintiff was, at all times relevant herein, a resident of Tulare County, California and a Porterville Police Department employee.

5. The City of Porterville is Charter City, located in Tulare County California, which is within the jurisdiction of this Court.

6. Porterville Police Department ("PPD") is a Department of the City of Porterville.

PLAINTIFF'S COMPLAINT & JURY DEMAND

7.     Plaintiff alleges on information and belief that Defendant Michael Benas was, at all times relevant herein, employed by the Porterville Police Department and a resident of Tulare County.

8.     Plaintiff alleges on information and belief that Defendant Gary Miller was, at all times relevant herein, employed by the Porterville Police Department and a resident of Tulare County.

9.     Plaintiff alleges on information and belief that Defendant Mark Azavedo was, at all times relevant herein, employed by the Porterville Police Department and a resident of Tulare County.

10.     Plaintiff alleges on information and belief that Defendant Richard Standridge was, at all times relevant herein, employed by the Porterville Police Department and a resident of Tulare County.

11.     Plaintiff is informed and believes and upon such information and belief alleges that each of the defendants herein was, at all times relevant to the action, an agent, employee, and/or co-conspirator of the remaining defendants and was acting within the course and scope of that relationship.  Plaintiff is further informed and believes and upon such information and belief alleges that each of the defendants herein gave consent to, ratified, and authorized the acts alleged herein of each of the remaining defendants.

**JURISDICTION & VENUE**

12.     Jurisdiction is proper in this Court under 28 U.S.C. 1331 because three of Plaintiff's causes of action are based on federal statutes.

13.     Venue is proper in this Court because some or all of the acts upon which Plaintiff bases her causes of action took place within the geographic jurisdiction of the United States District Court for the Eastern District of California, Fresno Division.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

14.     On October 9, 2020, Plaintiff filed a complaint with the United States Equal Opportunity Commission ("EEOC"), which cross-filed her complaint with the California

Department of Fair Employment & Housing ('DFEH") and issued Plaintiff a "right-to-sue" notice on May 18, 2021. The DFEH issued Plaintiff a "right-to-sue" notice on October 14, 2020.

**FACTUAL ALLEGATIONS**

**Background**

15. Throughout her career at the Porterville Police Department, Plaintiff was subjected to discrimination based upon her gender and her sexual orientation.

16. The discrimination included repeated denigrating comments about women in general, statements that women should not be allowed to work as police officers or on particular units, comments about Plaintiff's personal relationship and her sexual orientation, repeated unwelcome sexual advances, the creation of a sexually hostile work environment and the denial of promotions.

17. Plaintiff did her best to ignore the inappropriate and discriminatory conduct to which she was repeatedly being subjected, in the hope that by doing so she would be accepted and recognized for her performance as a police officer. Her efforts partially succeeded, in so far as she successfully demonstrated her commitment and ability to perform as an outstanding peace officer. However, her demonstrated commitment and ability to perform as an outstanding peace officer failed to end the ongoing discriminatory treatment to which she was subjected by some of her fellow officers and superiors, including the defendants named in this complaint.

18. Her demonstrated commitment and ability to perform as an outstanding peace officer also failed to prevent the PPD from discriminating against her in making promotion decisions.

19. More recently, newer female officers were being subjected to sex harassment and looked to Plaintiff as an experienced officer for help and guidance. When Plaintiff both opposed the treatment to which these younger female officers were being subjected and reported the same up to the highest level of the PPD chain of command, she became the target of a campaign of retaliation that included, but was not limited to, months of abusive conduct, being yelled at, dressed down in front of other officers, and constantly being unjustifiably criticized. This

campaign of retaliation was intended to, and did, forced Plaintiff to resign and give up the career she had worked so hard to establish.

<u>**The Discrimination and Retaliation to which Plaintiff**</u>

<u>**was subjected by the individual Defendants.**</u>

**Defendant Michael Benas**

20.     When Plaintiff started as a full-time officer in 2011, then Officer Benas was Plaintiff's field training officer. The PPD administration knew Benas had a reputation for trying to sleep with his female trainees. During this time, Officer Benas would make many sexual inappropriate comments to Plaintiff. Officer Benas would make comments about Plaintiff's buttocks and how it looked in her pants. Officer Benas would often call and text Plaintiff in the middle of the night (after hours and on days off) trying to get her to go out drinking with him or asking her if he could come over. Officer Benas's unwanted calls and texts often caused fights between Plaintiff and her partner at the time and contributed to the termination of that relationship.

21.     Officer Benas had a reputation for being inappropriate not with only female officers, but females out in the community who worked at stores, bars or coffee places (including under-age girls). When he found out that Plaintiff was a lesbian, he would often call Plaintiff to assist him on traffic stops and calls for service just to ask Plaintiff her opinion if the women he was stopping or contacting were "hot" and ask Plaintiff if she would do inappropriate sexual acts to certain girls.

22.     There were probably 10-15 occasions where Officer Benas would have Plaintiff shake out a girl's bra and search the girl just so he could watch. On almost every single occasion, nothing was found and Plaintiff later learned that there was no probable cause for the search. Officer Benas would show Plaintiff nude photographs of girls and Plaintiff would tell Officer Benas his pictures were inappropriate.

23.     Officer Benas' conduct eventually became so intolerable that Plaintiff applied for and accepted a position with Tulare County Sheriff's Department. Shortly after she left the PPD,

however, she was contacted by Captain Castellow, who informed her that Officer Benas was no longer employed by the PPD and if she returned she would be given a raise and would no longer be supervised by Defendant Gary Miller.

**Defendant Gary Miller**

24.     Sergeant Miller became Plaintiff's direct supervisor in 2015 when she was assigned to the Special Investigations Unit. During the time Sergeant Miller supervised Plaintiff, he often asked her about her sexual orientation and questioned why she was gay. Sergeant Miller would tell Plaintiff that being gay is a choice and women were made to have babies and be at home "cooking in the kitchen." Sergeant Miller would also often make comments about how Plaintiff would prefer men if she tried them and she should give an old man like him a shot. Sergeant Miller would also tell Plaintiff she was "easy-on-the-eyes" and he'd ask her if an old man like him could ever be her type.

25.     As mentioned above, When Plaintiff returned to the PPD in 2015, she was assured she would no longer report to Sergeant Miller.  However, Sergeant Miller became Plaintiff's direct supervisor again in 2019. During that time, Sergeant Miller often would make comments how this job is not for women and women belong at home in the kitchen. Sergeant Miller would often bend over in front of Plaintiff and ask her if she liked what she saw (his buttocks). He would also again tell Plaintiff she was "easy-on-the-eyes" and it was too bad she was gay. Sergeant Miller would also often vent to Plaintiff about other females in the department and he would tell Plaintiff how incompetent females are.

26.     In February 2019, Plaintiff resigned as a field training officer for personal reasons. Sergeant Miller asked Plaintiff why she was resigning her field officer assignment. He told her it was not a good look for her if she ever wanted to apply to another police department. Sergeant Miller told Plaintiff she was being an ungrateful "little bitch" and she needed to be more of a "company man."

27.     Sergeant Miller gave back Plaintiff's FTO resignation letter on two occasions and told her she could not just resign. Plaintiff informed Sergeant Miller she was allowed to resign

6

because being a field training officer was a choice and she no longer had the desire to do it. After a brief conversation with Sergeant Miller about the letter of resignation, Sergeant Miller pulled Plaintiff into Lieutenant Standridge's office and began yelling at Plaintiff. Sergeant Miller again told me Plaintiff she was ungrateful and she was being a brat. Sergeant Miller and Lieutenant Standridge then proceeded to tell Plaintiff they already knew she was applying to another police department and so this was not a good look for her and they would be putting it in her background file for outside agencies to see.

28. During this same meeting, Plaintiff reported that Sergeant Miller favored the male officers and mistreated and unjustifiably criticized the female officers. Plaintiff also brought up how Sergeant Miller was quick to write up a female officer and deny female officers vacation requests. Sergeant Miller would even cancel female officers' vacation requests after approving them and he would not do this to male officers. Sergeant Miller denied any favoritism and Lieutenant Standridge stood up for Sergeant Miller stating Plaintiff was just upset. Plaintiff requested to be transferred to a different supervisor rather than continuing to be subject to Sergeant Miller's discriminatory behavior, but Lieutenant Standridge denied my request.

**Lieutenant Standridge**

29. Lieutenant Standridge harassed and discriminated against Plaint beginning in 2011 when She first started working full time for PPD. Lieutenant Standridge would often try and write Plaintiff up for not responding to his email or not checking her work email when he wanted. Lieutenant Standridge would also unjustifiably criticize Plaintiff's work and question her decisions. Sergeants Knox and other Sergeants would often have to stand up for Plaintiff and tell Lieutenant Standridge to stop picking on her.

30. In February 2020 when Plaintiff tried to resign as a field training officer, Lieutenant Standridge would not accept her letter of resignation. Lieutenant Standridge told Plaintiff that Captain Jake Castellow wanted a "reasoning" for her resignation so it would look bad in Plaintiff's file. Lieutenant Standridge informed Plaintiff that the command staff knew she

PLAINTIFF'S COMPLAINT & JURY DEMAND

was applying elsewhere and this was not going to look good for her when they came to do her background investigation.

31. When Lieutenant Standridge denied Plaintiff resignation of her assignment as a field training officer, she requested to speak with the Chief about it. Lieutenant Standridge and Captain Castellow refused to let her speak to the Chief. Lieutenant Standridge and Captain Castellow both told Plaintiff that they were going to make Plaintiff submit a "reasoning" for her resignation so she would be tarnishing her own career.

32. In May 2019, Plaintiff received her first ever, bad evaluation. Captain Castellow ordered Lieutenant Standridge to write Plaintiff's evaluation even though Lieutenant Standridge was not Plaintiff's direct supervisor. In the evaluation he wrote, Lieutenant Standridge criticized Plaintiff's use of sick leave even though she had doctor's notes excusing her from work, and she had never been verbally warned about her use of sick time. Lieutenant Standridge also added that Plaintiff's abused her sick time and earned vacation time, which was not true. He added this to try and prevent Plaintiff from getting hired at another agency.

33. Plaintiff was later informed by Corporal Gray (who is a union representative) that Lieutenant Standridge should not have written Plaintiff's evaluation and what was said in it was not right. Corporal Gray also informed Plaintiff that the administration was "out to get her." Corporal Gray further added that he was told by the Captains to not to let Plaintiff join the union because Plaintiff was in "hot water."

34. Lieutenant Standridge often asked Plaintiff about why she was sick and what her doctor's notes said, in violation of HIPAA. Lieutenant Standridge also denied Plaintiff bereavement leave when her grandmother passed and told Plaintiff she would need to use her vacation time, not her sick or bereavement time to attend the funeral.

35. Lieutenant Standridge would check Plaintiff's and another female officers' GPS just to harass therm. He would also repeatedly inspect the police vehicle assigned to Plaintiff claiming he was making to make sure it was clean and the gas was half full, when in reality he

1   was simply looking for an excuse to write up Plaintiff. Lieutenant Standrige would do these
2   things to Plaintiff, and other female officers, and he did not do them to the male officers.

### Lieutenant Mark Azevedo

4   36.    Lieutenant Mark Azevedo was the Narcotics Sergeant in 2017, when he started
5   making unwanted sexual advances towards Plaintiff. Lieutenant Azevedo would call Plaintiff
6   from various texting application numbers and ask her if she wanted to go to his house and drink
7   with him when his wife was not home. Each time, Plaintiff politely told him no because she was
8   friends with his wife, who was one of the PPD dispatchers, and Plaintiff respected his wife too
9   much to do that.  Lieutenant Azevedo did not take no for an answer. He would continually call
10  Plaintiff and ask her to go to his house and "spend time" with him. Corporal Enrique Lara (then
11  officer Lara) would also get on the phone and make comments to encourage me to drink/hang
12  out with Lieutenant Azevedo.

13  37.    Plaintiff left for the Army Reserve duty in August 2017.  She returned from in
14  December of 2017. After she returned, Lieutenant Azevedo again began asking Plaintiff to hang
15  out with him.  He would also ask Plaintiff if she'd be interested in a guy like him. Plaintiff again
16  told Lieutenant Azevedo that she was not interested in him or willing to hang out with him
17  because she respected his wife more than that.

18  38.    In February 2019, Lieutenant Azevedo and Plaintiff were having a conversation
19  when he again asked Plaintiff to come hang out with him and have beers at his house when his
20  wife was not home. Plaintiff again told Lieutenant Azevedo she was not interested in having
21  beers with him. Lieutenant Azevedo then told Plaintiff he was going through a divorce so it was
22  okay to hang out with him because he could not get in trouble anymore with his "soon to be ex-
23  wife."  Plaintiff told Lieutenant Azevedo that his hitting on other women was probably the
24  reason for his divorce. From thar point forward, Lieutenant Azevedo started retaliating against
25  Plaintiff.

26  39.    Later in February 2019, Lieutenant Azevedo wrote Plaintiff up for something that
27  was not even a policy violation, even though he was not her supervisor. Plaintiff tried to contest
28

9

the write up and was told by him that she could not contest it and she had to sign it. During Plaintiff's conversation with Lieutenant Azevedo about this write up, Lieutenant Azevedo told Plaintiff that he held her to a higher standard because she was a "no-women" and not a "yes-woman." Plaintiff asked Lieutenant Azevedo what he meant by this and he responded by laughing and telling Plaintiff she knew what he meant.

40. In June 2019, Lieutenant Azevedo started having Sergeant Martinez hold Plaintiff's reports so Lieutenant Azevedo could review them. This was completely out of the norm and a form of retaliation against Plaintiff. After he would review Plaintiff's reports, Lieutenant Azevedo would critique and criticize Plaintiff's work and her decision-making. There were at least three occasions when Lieutenant Azevedo would pull Plaintiff into his office (one on one) and criticize her for how she handled certain calls or traffic stops. Plaintiff finally asked Lieutenant Azevedo what he wanted from her and why she was being treated this way. Lieutenant Azevedo's response was that she had put target on her back that would go away eventually. Plaintiff asked Lieutenant Azevedo if he was trying to get her to quit and he told her he was testing her. Lieutenant Azevedo added that if she applied to another department, she'd be "blackballed."

41. In the summer of 2019, Plaintiff was injured while away on Army orders, serving her country. After returning to full duty in December of 2019, Lieutenant Azevedo again began unjustifiably criticizing Plaintiff's work. Lieutenant Azevedo would review her body camera footage even when it was not necessary and he would make it a point to embarrass her in briefings and humiliate her in front of other officers. Lieutenant Azevedo would often also tell Plaintiff's direct partner what a good job he was doing and how Plaintiff needed to stop being injured so she could work as many hours as him. Lieutenant Azevedo would also make it a point to deny Plaintiff overtime telling her she did not deserve it.

42. On February 18th, 2020, the City of Porterville lost two Fire Fighters in a structure fire. Those two Fire Fighters were two of Plaintiff's closest friends. The fire burned for three days and Plaintiff was at the scene and did not leave until both of her friends' bodies were

located and extracted from the debris. During the fire, Lieutenant Azevedo was assigning overtime for scene security and Plaintiff asked him if she could work the overtime since she was already there. Lieutenant Azevedo refused to let Plaintiff work any overtime and he again stated he was not going to reward Plaintiff for something she did not earn.

43. After her friends' tragic deaths, Plaintiff was given permission by the Chief to attend the funeral services. Lieutenant Azevedo told Plaintiff he did not care if she had permission from the Chief, she was not going to attend the funerals because she needed to work and get back to "business as usual." Lieutenant Azevedo also told Plaintiff that her friends (the Fire Fighters) were already dead so she needed to get over it because it was "rubbing him the wrong way."

44. When it came time for the day of the actual funeral services, Lieutenant Azevedo again told Plaintiff she was not going to go into the church and she needed to be at her post working traffic control. Even though there was plenty of coverage and Plaintiff was not needed on traffic control, Lieutenant Azevedo still refused to let her go to the funeral services.

45. After getting permission from Sergeant Ward who had to override Lieutenant Azevedo's decision, Plaintiff was able to attend part of the memorial services. The entire time she was in the church, Lieutenant Azevedo was having Sergeant Ward call Plaintiff and text her to tell me her she needed to get back to her traffic assignment. Plaintiff had to walk out in the middle of the memorial services and was never able to get closure.

46. In April 2020, Plaintiff dislocated her shoulder and tore her bicep at work during a fight with a combative subject. She worked with this injury for over a month before seeing a doctor because she knew she'd be retaliated against for getting injured. After seeing a doctor and confirming her injury, the doctor placed Plaintiff on restrictions and PPD refused to accommodate Plaintiff with light duty. After returning to work, Plaintiff's direct team was being sent to the riots in San Francisco. Plaintiff was excluded from going and when she asked Lieutenant Azevedo and Lieutenant Nix why she was not being sent, they told her they were not going to reward Plaintiff for being hurt. Plaintiff stayed behind and instead of working her

specialty assignment, they made her work patrol as a punishment for being injured and in retaliation for opposing and reporting the sex harassment to which the newer and younger female officers were being subjected.

47.     When Covid 19 first started, PPD placed officers on a "Covid schedule." Some officers were placed on call, while others worked for a premium wage. On May 14, 2020, Plaintiff was not on call until 2200 hours. Lieutenant Azevedo had Sergeant Martinez call Plaintiff in at 2100 hours. Plaintiff informed dispatch that she was not on call until 2200 hours so she could not respond until then because she was baby-sitting. Dispatch informed Plaintiff that Lieutenant Azevedo was not taking no for an answer and she needed to respond ASAP. There were two other male officers on call that night and both of them lived in town, but neither of them were called in. After Plaintiff arrived at the police department, she quickly realized she was not needed and she was called in as part of the ongoing campaign of retaliation to which she was being subjected retaliation. Plaintiff was later told that Lieutenant Azevedo was trying to see if Plaintiff would fail to respond so he could reprimand her. Plaintiff was also informed by Sergeant Martinez and Sergeant Ward that Lieutenant Azevedo was in fact targeting her.

48.     A similar incident happened the next weekend. Plaintiff worked all night. She was on her day off when Sergeant Ward gave her a courtesy call to let her know that she needed to respond to the shooting range. Sergeant Ward said he received a phone call from Lieutenant Nix and Lieutenant Azevedo and they intended to reprimand her if she did not go to range training that day. Plaintiff had not been informed prior to Sergeant Ward's call that she needed to attend range training that day, but Sergeant Ward informed her both Lieutenants called him and specifically requested he let them know if she failed to attend.

49.     In June 2020, Lieutenant Azevedo told Plaintiff she was getting too old for this "game" and she should consider resigning from SWAT since she's "always" getting hurt. Lieutenant Azevedo also hinted that Plaintiff "burned bridges" at the police department so the chances of me promoting were slim to none because she had "pissed people off."

PLAINTIFF'S COMPLAINT & JURY DEMAND

**Captain Jake Castellow**

50.    After Plaintiff reported the sexual harassment to which newer, younger female Officers were being subjected, Captain Jake Castellow, who had originally been supportive of Plaintiff, orchestrated the campaign of retaliation that forced Plaintiff to resign.  He was the one who instructed Lieutenant Standridge to give Plaintiff her only negative performance appraisal. He also permitted and encourage Lieutenant Standridge, Lieutenant Azevedo and Sergeant Miller to harass Plaintiff, to humiliate her, criticize her unjustifiably, and dress her down and yell at her in front of her colleagues.

**Final Act of Discrimination and Retaliation**

51.    After enduring months of abusive conduct, being yelled at, dressed down in front of other officers, and constantly being unjustifiably criticized, Plaintiff was ordered to take a physical diagnostic test despite being injured and providing a doctor's note advising that she should not take the test. Other similarly situated male officers were not being required to take the test at that time, but Plaintiff was not allowed to wait and take the test when they did so, which would have given her time to recover from her injury. This was the final straw in a campaign of retaliation intended to force Plaintiff to quit. Plaintiff had been having nightmares and anxiety caused by the discrimination and retaliation describe above, including the treatment Plaintiff received in February, 2020 after the deaths of my two Fire Fighter close friends. She simply could no longer work for a police department that did not care about her or her health and refused to address the discrimination and retaliation to which she and other female offers were being subjected. She could no longer continue to be bullied, discriminated against or retaliated against. This all took an emotional toll on her.  So in the best interest of her sanity, her emotional health and her marriage, Plaintiff concluded that she had to resign.  Her last paid day at the Porterville Police Department was July 18, 2020.

**FIRST CAUSE OF ACTION: SEX DISCRIMINATION
IN VIOLATION OF TITLE VII
(Against Defendant City of Porterville)**

52.    Plaintiff incorporates herein the allegations set forth above.

13

53.     Title VII of the Civil Rights Act of 1964 prohibits discrimination on the basis of a person's sex and/or sexual orientation.

54.     As more fully described above, Defendants discriminated against Plaintiff based on her sex and her sexual orientation.

55.     As a result of Defendant's violations of the FEHA, Plaintiff has suffered, and will continue to suffer, damages, including, but not limited to, loss of income, loss of enjoyment of life, emotional distress, and damage to her health and personal and professional reputations.

56.     In light of the willful, knowing and intentional retaliation committed by and on behalf of Defendants against Plaintiff, Plaintiff requests an award of punitive damages in an amount according to proof.

**SECOND CAUSE OF ACTION:**
**RETALIATION IN VIOLATION OF TITLE VII**
**(Against Defendant City of Porterville)**

57.     Plaintiff incorporates herein the allegations set forth above.

58.     Title VII of the Civil Rights Act of 1964, *42* of the United States Code, section 2000e, *et seq.,* prohibits retaliation against an employee who opposes or reports sex discrimination.

59.     As described more fully above, Defendants retaliated against Plaintiff for opposing and reporting the sex harassment to which she and other female officers were being subjected.

60.     As a result of Defendant's violations of the FEHA, Plaintiff has suffered, and will continue to suffer, damages, including, but not limited to, loss of income, loss of enjoyment of life, emotional distress, and damage to her health and personal and professional reputations.

61.     In light of the willful, knowing and intentional retaliation committed by and on behalf of Defendants against Plaintiff, Plaintiff requests an award of punitive damages in an amount according to proof.

**THIRD CAUSE OF ACTION: DEPRIVATION OF CIVIL RIGHTS**
**IN VIOLATIONS OF 42 U.S.C SECTION 1983**
**(Against Defendants City of Porterville, Michael Benas,**
**Mark Azevedo, Gary Miller, Richard Standridge)**

62.  Plaintiff incorporates herein the allegations set forth above.

63.  42 U.S.C. section 1983 creates a private right of action against any "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."

64.  As described more fully above, Defendants deprived Plaintiff of her First Amendment Constitutional right to petition the government for redress of grievances, as well as her federal statutory rights (1) to work in an environment free of discrimination based upon gender or sexual orientation and (2) to oppose and report discrimination gender or sexual orientation.

65.  As a result of Defendant's violations of the section 1983, Plaintiff has suffered, and will continue to suffer, damages, including, but not limited to, loss of income, loss of enjoyment of life, emotional distress, and damage to her health and personal and professional reputations.

66.  In light of the willful, knowing and intentional acts in violation of section 1983 committed by and on behalf of Defendants against Plaintiff, Plaintiff requests an award of punitive damages in an amount according to proof.

### FOURTH CAUSE OF ACTION: SEX DISCRIMINATION IN VIOLATION OF THE FEHA
#### (Against Defendant City of Porterville)

67.  Plaintiff incorporates herein the allegations set forth above.

68.  California's Fair Employment and Housing Act ("FEHA"), California Government Code Section 12900, *et. seq*., prohibits discrimination on the basis of a person's sex and/or sexual orientation.

69.  As more fully described above, Defendants discriminated against Plaintiff based on her sex and her sexual orientation.

70.  As a result of Defendant's violations of the FEHA, Plaintiff has suffered, and will

15

continue to suffer, damages, including, but not limited to, loss of income, loss of enjoyment of life, emotional distress, and damage to her health and personal and professional reputations.

71.     In light of the willful, knowing and intentional retaliation committed by and on behalf of Defendants against Plaintiff, Plaintiff requests an award of punitive damages in an amount according to proof.

**FIFTH CAUSE OF ACTION:**
**RETALIATIONIN VIOLATION OF THE FEHA**
**(Against Defendant City of Porterville)**

72.     Plaintiff incorporates herein the allegations set forth above.

73.     California's Fair Employment and Housing Act ("FEHA"), California Government Code Section 12900, *et. seq*., prohibits retaliation against an employee who opposes or reports discrimination on the basis of a person's sex and/or sexual orientation.

74.     As more fully described above, Defendants discriminated against Plaintiff based on her sex and her sexual orientation.

75.     As a result of Defendant's violations of the FEHA, Plaintiff has suffered, and will continue to suffer, damages, including, but not limited to, loss of income, loss of enjoyment of life, emotional distress, and damage to her health and personal and professional reputations.

76.     In light of the willful, knowing and intentional retaliation committed by and on behalf of Defendants against Plaintiff, Plaintiff requests an award of punitive damages in an amount according to proof.

**SIXTH CAUSE OF ACTION: RETALIATION**
**IN VIOLATION THE LABOR CODE SECTION 1102.5**
**(Against Defendants City of Porterville)**

77.     Plaintiff incorporates herein the allegations set forth above.

78.     California's Whistleblower Protection Act ("WBPA"), California Government Code Section 8547, *et. seq*., prohibits retaliation against an employee who opposes or reports what the employee reasonably believes is a violation of law or regulation. As described more fully above, Defendants retaliated against Plaintiff  because she opposed and reported the discrimination and harassment to which she and other female officers were being subjected.

79. As a result of Defendant's violations of the FEHA, Plaintiff has suffered, and will continue to suffer, damages, including, but not limited to, loss of income, loss of enjoyment of life, emotional distress, and damage to her health and personal and professional reputations.

80. In light of the willful, knowing and intentional retaliation committed by and on behalf of Defendants against Plaintiff, Plaintiff requests an award of punitive damages in an amount according to proof.

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

A. For lost compensation and related employment benefits, past and future, according to proof;

B. For special damages according to proof;

C. For compensatory damages for mental and emotional distress;

D. For punitive damages;

E. For reasonable costs and attorney's fees;

F. For prejudgment interest from the date of Plaintiff's discharge;

G. An injunction requiring the City of Porterville to revise its policies and practices to eliminate the hostile and discriminatory culture at the Porterville Police Department and to institute a fair and non-discriminatory promotion process.

H. An order requiring the City of Porterville to offer Plaintiff the choice of being rehired by the Porterville Police Department in a position for which she is qualified and to which she would have been promoted but for the discrimination and retaliation to which she was subjected;

\\

\\

\\

\\

\\

I.     The appointment Special Master or Monitor to ensure the City of Porterville carries out the orders of this Court;

J.     For such other and further relief that the Court may deem just and proper.


Dated:  May 26, 2021                    Respectfully submitted,

                                        LAW OFFICES OF LAWRENCE J. KING


                                        By: __/S/_____
                                            Lawrence J. King