Lawrence J. King, Esq., #120805
LAW OFFICES OF LAWRENCE J. KING
11 Western Avenue
Petaluma, CA 94952
Telephone: 707-769-9791
Fax: 707-769-9253
Email: kingesq@pacbell.net

Attorneys for Plaintiff Amber Moreno

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

| | |
|---|---|
| AMBER MORENO,<br><br>      Plaintiff,<br><br>v.<br><br><br>CITY OF PORTERVILEE, MICHAEL BENAS, GARY MILLER, and MARK AZEVEDO,<br><br>      Defendants. | CASE NO. 1:21-at-00590<br><br>**PLAINTIFF'S SECOND AMENDED COMPLAINT FOR:**<br>**(1) SEX DISCRIMINATION IN VIOLATION OF TITLE VII ,**<br>**(2) RETALIATION IN VIOLATION OF TITLE VII,**<br>**(3) SEX HARASSMENT IN VIOLATION OF THE FEHA,**<br>**(4) SEX DISCRIMINATION IN VIOLATION OF THE FEHA,**<br>**(5) RETALIATION IN VIOLATION OF THE FEHA, AND**<br>**(6) FAILURE TO TAKE IMMEDIATE AND APPROPRIATE ACTION TO PREVENT AND REMEDY THE SEXUAL HARASSMENT TO WHICH PLAINTIFF WAS SUBJECTED IN VIOLATION OF THE FEHA**<br><br>**AND**<br><br>**PLAINTIFF'S DEMAND FOR A JURY TRIAL.**<br><br>**UNLIMITED CIVIL ACTION.** |

  NOW COMES PLAINTIFF **AMBER MORENO,** and files this her complaint, demanding a jury trial and alleging the following:

1

**INTRODUCTION**

1. The Porterville Police Department has a problem. Its male leadership has yet to absorb the lessons of the "Me Too Movement" and to comply with California and Federal law prohibiting discrimination against its female officers. Now it is poised to appoint as the Chief of the Porterville Police Department a Captain who threatened and intimidated the victims of sex harassment and protected the harassers.

2. Plaintiff Amber Moreno joined the Porterville Police Department in March of 2011, determined to prove that she could be as good a police officer as any man on the force. To do so, she endured sexist, misogynist, and homophobic comments by her fellow officers and superiors. To do so, she had to persevere in the face of a culture of sex discrimination, but she did so. Ultimately though, when she stood up for the newer, younger, female officers and reported the sex harassment to which they were being subjected, Plaintiff became the target of a virulent campaign of retaliation that was intended to, and did, force her to abandon the career for which she had fought so hard.

3. Plaintiff brings this suit to vindicate her right, and the right of all California employees the right to work in an environment free from discrimination and to report what an employee reasonably believes is a violation of law or regulation, without being retaliated against for doing so. The essence of Plaintiff's claims is that: (1) she was discriminated against on the basis of her gender and her sexual orientation and (2) she was retaliated against because she reported the discrimination to which she and other female employees were subjected.

**PARTIES AND VENUE**

4. Plaintiff was, at all times relevant herein, a resident of Tulare County, California and a Porterville Police Department employee.

5. The City of Porterville is Charter City, located in Tulare County California, which is within the jurisdiction of this Court.

6. Porterville Police Department is a Department of the City of Porterville.

7. Plaintiff alleges on information and belief that Defendant Defendant Benas was, at all times relevant herein, employed by the Porterville Police Department and a resident of Tulare County.

8. Plaintiff alleges on information and belief that Defendant Gary Miller was, at all times relevant herein, employed by the Porterville Police Department and a resident of Tulare County.

9. Plaintiff alleges on information and belief that Defendant Mark Azavedo was, at all times relevant herein, employed by the Porterville Police Department and a resident of Tulare County.

10. Plaintiff is informed and believes and upon such information and belief alleges that each of the defendants herein was, at all times relevant to the action, an agent, employee, and/or co-conspirator of the remaining defendants and was acting within the course and scope of that relationship. Plaintiff is further informed and believes and upon such information and belief alleges that each of the defendants herein gave consent to, ratified, and authorized the acts alleged herein of each of the remaining defendants.

## JURISDICTION & VENUE

11. Jurisdiction is proper in this Court under 28 U.S.C. 1331 because three of Plaintiff's causes of action are based on federal statutes.

12. Venue is proper in this Court because some or all of the acts upon which Plaintiff bases her causes of action took place within the geographic jurisdiction of the United States District Court for the Eastern District of California, Fresno Division.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

13. On October 9, 2020, Plaintiff filed a complaint with the United States Equal Opportunity Commission ("EEOC"), which cross-filed her complaint with the California Department of Fair Employment & Housing ('DFEH') and issued Plaintiff a "right-to-sue" notice on May 18, 2021. The DFEH issued Plaintiff a "right-to-sue" notice on October 14, 2020.

3

PLAINTIFF'S SECOND AMENDED COMPLAINT & JURY DEMAND

## FACTUAL ALLEGATIONS

### Background

14. Throughout her career at the Porterville Police Department, Plaintiff was subjected to sexual harassment, as well as discrimination based upon her gender and her sexual orientation, which created a hostile work environment that ultimately forced her to quit.

15. The sexual harassment and discrimination included repeated denigrating comments about women in general, statements that women should not be allowed to work as police officers or on particular units, comments about Plaintiff's personal relationship and her sexual orientation, repeated unwelcome sexual advances, the creation of a sexually hostile work environment and the denial of promotions.

16. Plaintiff did her best to ignore the inappropriate and discriminatory conduct to which she was repeatedly being subjected, in the hope that by doing so she would be accepted and recognized for her performance as a police officer. Her efforts partially succeeded, in so far as she successfully demonstrated her commitment and ability to perform as an outstanding peace officer. However, her demonstrated commitment and ability to perform as an outstanding peace officer failed to end the ongoing discriminatory treatment to which she was subjected by some of her fellow officers and superiors, including the defendants named in this complaint.

17. Her demonstrated commitment and ability to perform as an outstanding peace officer also failed to prevent the Porterville Police Department from discriminating against her in making promotion decisions.

18. More recently, newer female officers were being subjected to sex harassment and looked to Plaintiff as an experienced officer for help and guidance. When Plaintiff both opposed the treatment to which these younger female officers were being subjected and reported the same up to the highest level of the Porterville Police Department chain of command, she became the target of a campaign of retaliation that included, but was not limited to, months of abusive conduct, being yelled at, dressed down in front of other officers, and constantly being unjustifiably criticized. This campaign of retaliation was intended to, and did, forced Plaintiff to

resign and give up the career she had worked so hard to establish.

**The Harassment, Discrimination and Retaliation to which Plaintiff was Subjected.**

The following are examples, but not every incident, of the sexual harassment, discrimination and retaliation to which Plaintiff was subjected.

**Corporal Michael Benas**

19. When Plaintiff started as a full-time officer in 2011, then Defendant Benas was Plaintiff's field training officer. The Porterville Police Department administration knew Benas had a reputation for trying to sleep with his female trainees. During this time, Defendant Benas would make many sexual inappropriate comments to Plaintiff. Defendant Benas would make comments about Plaintiff's buttocks and how it looked in her pants. Defendant Benas would often call and text Plaintiff in the middle of the night (after hours and on days off) trying to get her to go out drinking with him or asking her if he could come over. Defendant Benas' unwanted calls and texts often caused fights between Plaintiff and her partner at the time and contributed to the termination of that relationship. Plaintiff made clear to Defendant Benas that his conduct was unwelcome.

20. Defendant Benas had a reputation for being inappropriate not with only female officers, but females out in the community who worked at stores, bars or coffee places (including under-age girls). When he found out that Plaintiff was a lesbian, he would often call Plaintiff to assist him on traffic stops and calls for service just to ask Plaintiff her opinion if the women he was stopping or contacting were "hot" and ask Plaintiff if she would do inappropriate sexual acts to certain girls.

21. There were probably 10-15 occasions where Defendant Benas would have Plaintiff shake out a girl's bra and search the girl just so he could watch. On almost every single occasion, nothing was found and Plaintiff later learned that there was no probable cause for the search. Defendant Benas would show Plaintiff nude photographs of girls and Plaintiff would tell Defendant Benas his pictures were inappropriate.

PLAINTIFF'S SECOND AMENDED COMPLAINT & JURY DEMAND

22. Defendant Benas' conduct eventually became so intolerable that Plaintiff applied for and accepted a position with Tulare County Sheriff's Department. Shortly after she left the Porterville Police Department, however, she was contacted by Captain Castellow, who informed her that Defendant Benas was no longer employed by the Porterville Police Department and if she returned to the Porterville Police Department she would be given a raise and would no longer be supervised by Defendant Gary Miller.

23. Defendant Benas returned to the Porterville Police Department in December 2018. When he and Plaintiff would be on patrol together, he would ask Plaintiff if the women he was pulled over were "hot." This was the same behavior he had demonstrated before he went to the Sheriff's Department. He also had Plaintiff shake out women' bras on some of the traffic stops, just so that he could watch. Defendant Benas apparently got off on stuff like this, thinking it was funny, when, in reality, he was being perverted and it was a violation of people's rights. This happened on multiple occasions.

24. From February, 2019 through April, 2019, Defendant Benas started sexually harassing Officers Erika Rodriguez and Darcy Jones. Both of these females confided in Plaintiff about the unwanted sexual behavior and the comments that were being made. Plaintiff personally heard the comments that were being made by Defendant Benas regarding these two females. Defendant Benas' conduct created a sexually hostile work environment for Plaintiff and the other female officers. Plaintiff went to the Chief and reported Defendant Benas's inappropriate behavior. After complaining to the Chief about Benas's sexual harassment of female officers, Plaintiff was subjected to a campaign of retaliation.

25. In March 2020, Plaintiff was at SWAT training with TCSO. During this training, Defendant Benas picked up a doughnut filled with cream and inappropriately licked the inside of the donut in a sexual manner and asked Plaintiff if that was how "it" was done. Defendant Benas found this behavior funny when it was clearly inappropriate. Defendant Benas was the acting SWAT Sergeant at the time so Plaintiff felt like she could not speak up and say anything about his inappropriate behavior because she knew she would further be retaliated against.

PLAINTIFF'S SECOND AMENDED COMPLAINT & JURY DEMAND

26. Despite his open and notorious inappropriate conduct, Defendant Benas was promoted to Corporal. On June 7, 2020, he was running the shift as an acting Sergeant. Defendant Benas had Plaintiff meet him at the police station and he asked her if she wanted to attend a kids birthday party with him for positive PR. Defendant Benas told Plaintiff that he was bringing Plaintiff so he and Plaintiff could check out all the "hot moms" while they were there. This type of behavior was not out of the ordinary for Defendant Benas and was unprofessional and uncomfortable for Plaintiff, but again, Plaintiff knew she could not say anything about it because she would continue to be retaliated against.

27. In June, 2020 Plaintiff attended SWAT training, during which she was wearing athletic wear. Defendant Benas made inappropriate comments/noises about Plaintiff's buttocks to other officers standing around and told Plaintiff she looked "damn fine" to him. Again, this type of behavior was not out of the ordinary for Defendant Benas - it was common behavior for him.

28. Defendant Benas' ongoing sexual harassment of Plaintiff and her female co-workers after he returned to the Porterville Police Department, as well as the Department's failure to address his inappropriate behavior, created a hostile work environment that was a substantial factor underlying Plaintiff's constructive termination.

### Sergeant Gary Miller

29. Sergeant Miller became Plaintiff's direct supervisor in 2015 when she was assigned to the Special Investigations Unit. During the time Sergeant Miller supervised Plaintiff, he often asked her about her sexual orientation and questioned why she was gay. Sergeant Miller would tell Plaintiff that being gay is a choice and women were made to have babies and be at home "cooking in the kitchen." Sergeant Miller would also often make comments about how Plaintiff would prefer men if she tried them and she should give an old man like him a shot. Sergeant Miller would also tell Plaintiff she was "easy-on-the-eyes" and he'd ask her if an old man like him could ever be her type.

PLAINTIFF'S SECOND AMENDED COMPLAINT & JURY DEMAND

30. As mentioned above, when Plaintiff returned to the Porterville Police Department in 2015, she was assured she would no longer report to Sergeant Miller. However, Sergeant Miller became Plaintiff's direct supervisor again in 2019. During that time, Sergeant Miller often would make comments how this job is not for women and women belong at home in the kitchen. Sergeant Miller would often bend over in front of Plaintiff and ask her if she liked what she saw (his buttocks). He would also again tell Plaintiff she was "easy-on-the-eyes" and it was too bad she was gay. Sergeant Miller would also often vent to Plaintiff about other females in the department and he would tell Plaintiff how incompetent females are. Defendant Miller's inappropriate comments created a sexually hostile work environment.

31. In February 2019, Plaintiff resigned as a field training officer for personal reasons. Sergeant Miller asked Plaintiff why she was resigning her field officer assignment. He told her it was not a good look for her if she ever wanted to apply to another police department. Sergeant Miller told Plaintiff she was being an ungrateful "little bitch" and she needed to be more of a "company man."

32. Sergeant Miller gave back Plaintiff's FTO resignation letter on two occasions and told her she could not just resign. Plaintiff informed Sergeant Miller she was allowed to resign because being a field training officer was a choice and she no longer had the desire to do it. After a brief conversation with Sergeant Miller about the letter of resignation, Sergeant Miller pulled Plaintiff into Lieutenant Standridge's office and began yelling at Plaintiff. Sergeant Miller again told me Plaintiff she was ungrateful and she was being a brat. Sergeant Miller and Lieutenant Standridge then proceeded to tell Plaintiff they already knew she was applying to another police department and so this was not a good look for her and they would be putting it in her background file for outside agencies to see.

33. During this same meeting, Plaintiff reported that Sergeant Miller favored the male officers and mistreated and unjustifiably criticized the female officers. Plaintiff also brought up how Sergeant Miller was quick to write up a female officer and deny female officers vacation requests. Sergeant Miller would even cancel female officers' vacation requests after approving

PLAINTIFF'S SECOND AMENDED COMPLAINT & JURY DEMAND

them and he would not do this to male officers. Sergeant Miller denied any favoritism and Lieutenant Standridge stood up for Sergeant Miller stating Plaintiff was just upset. Plaintiff requested to be transferred to a different supervisor rather than continuing to be subject to Sergeant Miller's discriminatory behavior, but Lieutenant Standridge denied Plaintiff's request.

**Lieutenant Standridge**

34. Lieutenant Standridge harassed and discriminated against Plaintiff beginning in 2011 when she first started working full time for Porterville Police Department. Lieutenant Standridge would often try and write Plaintiff up for not responding to his email or not checking her work email when he wanted. Lieutenant Standridge would also unjustifiably criticize Plaintiff's work and question her decisions. Sergeants Knox and other Sergeants would often have to stand up for Plaintiff and tell Lieutenant Standridge to stop picking on her.

35. In February, 2019 when Plaintiff tried to resign as a field training officer, Lieutenant Standridge would not accept her letter of resignation. Lieutenant Standridge told Plaintiff that Captain Jake Castellow wanted a "reasoning" for her resignation so it would look bad in Plaintiff's file. Lieutenant Standridge informed Plaintiff that the command staff knew she was applying elsewhere and this was not going to look good for her when they came to do her background investigation.

36. When Lieutenant Standridge denied Plaintiff resignation of her assignment as a field training officer, she requested to speak with the Chief about it. Lieutenant Standridge and Captain Castellow refused to let her speak to the Chief. Lieutenant Standridge and Captain Castellow both told Plaintiff that they were going to make Plaintiff submit a "reasoning" for her resignation so she would be tarnishing her own career.

37. In May 2019, Plaintiff received her first ever, bad evaluation. Captain Castellow ordered Lieutenant Standridge to write Plaintiff's evaluation even though Lieutenant Standridge was not Plaintiff's direct supervisor. In the evaluation he wrote, Lieutenant Standridge criticized Plaintiff's use of sick leave even though she had doctor's notes excusing her from work, and she had never been verbally warned about her use of sick time. Lieutenant Standridge also added that

Plaintiff's abused her sick time and earned vacation time, which was not true. He added this to try and prevent Plaintiff from getting hired at another agency.

38. Plaintiff was later informed by Corporal Gray (who is a union representative) that Lieutenant Standridge should not have written Plaintiff's evaluation and what was said in it was not right. Corporal Gray also informed Plaintiff that the administration was "out to get her." Corporal Gray further added that he was told by the Captains to not to let Plaintiff join the union because Plaintiff was in "hot water."

39. Lieutenant Standridge often asked Plaintiff about why she was sick and what her doctor's notes said, in violation of HIPAA. Lieutenant Standridge also denied Plaintiff bereavement leave when her grandmother passed and told Plaintiff she would need to use her vacation time, not her sick or bereavement time to attend the funeral.

40. Lieutenant Standridge would check Plaintiff's and another female officers' GPS just to harass therm. He would also repeatedly inspect the police vehicle assigned to Plaintiff claiming he was making to make sure it was clean and the gas was half full, when in reality he was simply looking for an excuse to write up Plaintiff. Lieutenant Standrige would do these things to Plaintiff, and other female officers, and he did not do them to the male officers.

**Lieutenant Mark Azevedo**

41. Lieutenant Mark Azevedo was the Narcotics Sergeant in 2017, when he started making unwanted sexual advances towards Plaintiff. Lieutenant Azevedo would call Plaintiff from various texting application numbers and ask her if she wanted to go to his house and drink with him when his wife was not home. Each time, Plaintiff politely told him no because she was friends with his wife, who was one of the PPD dispatchers, and Plaintiff respected his wife too much to do that. Lieutenant Azevedo did not take no for an answer. He would continually call Plaintiff and ask her to go to his house and "spend time" with him. Corporal Enrique Lara (then officer Lara) would also get on the phone and make comments to encourage Plaintiff to drink and hang out with Lieutenant Azevedo.

PLAINTIFF'S SECOND AMENDED COMPLAINT & JURY DEMAND

42. Plaintiff left for the Army Reserve duty in August 2017. She returned from in December of 2017. After she returned, Lieutenant Azevedo again began asking Plaintiff to hang out with him. He would also ask Plaintiff if she'd be interested in a guy like him. Plaintiff again told Lieutenant Azevedo that she was not interested in him or willing to hang out with him because she respected his wife more than that.

43. In February 2019, Lieutenant Azevedo and Plaintiff were having a conversation when he again asked Plaintiff to come hang out with him and have beers at his house when his wife was not home. Plaintiff again told Lieutenant Azevedo she was not interested in having beers with him. Lieutenant Azevedo then told Plaintiff he was going through a divorce so it was okay to hang out with him because he could not get in trouble anymore with his "soon to be ex-wife." Plaintiff told Lieutenant Azevedo that his hitting on other women was probably the reason for his divorce. From thar point forward, Lieutenant Azevedo started retaliating against Plaintiff.

44. Later in February 2019, Lieutenant Azevedo wrote Plaintiff up for something that was not even a policy violation, even though he was not her supervisor. Plaintiff tried to contest the write up and was told by him that she could not contest it and she had to sign it. During Plaintiff's conversation with Lieutenant Azevedo about this write up, Lieutenant Azevedo told Plaintiff that he held her to a higher standard because she was a "no-women" and not a "yes-woman." Plaintiff asked Lieutenant Azevedo what he meant by this and he responded by laughing and telling Plaintiff she knew what he meant.

45. In June 2019, Lieutenant Azevedo started having Sergeant Martinez hold Plaintiff's reports so Lieutenant Azevedo could review them. This was completely out of the norm and a form of retaliation against Plaintiff. After he would review Plaintiff's reports, Lieutenant Azevedo would critique and criticize Plaintiff's work and her decision-making. There were at least three occasions when Lieutenant Azevedo would pull Plaintiff into his office (one on one) and criticize her for how she handled certain calls or traffic stops. Plaintiff finally asked Lieutenant Azevedo what he wanted from her and why she was being treated this way.

11

PLAINTIFF'S SECOND AMENDED COMPLAINT & JURY DEMAND

Lieutenant Azevedo's response was that she had put target on her back that would go away eventually. Plaintiff asked Lieutenant Azevedo if he was trying to get her to quit and he told her he was testing her. Lieutenant Azevedo added that if she applied to another department, she'd be "blackballed."

46. In the summer of 2019, Plaintiff was injured while away on Army orders, serving her country. After returning to full duty in December of 2019, Lieutenant Azevedo again began unjustifiably criticizing Plaintiff's work. Lieutenant Azevedo would review her body camera footage even when it was not necessary and he would make it a point to embarrass her in briefings and humiliate her in front of other officers. Lieutenant Azevedo would often also tell Plaintiff's direct partner what a good job he was doing and how Plaintiff needed to stop being injured so she could work as many hours as him. Lieutenant Azevedo would also make it a point to deny Plaintiff overtime telling her she did not deserve it.

47. On February 18th, 2020, the City of Porterville lost two Fire Fighters in a structure fire. Those two Fire Fighters were two of Plaintiff's closest friends. The fire burned for three days and Plaintiff was at the scene and did not leave until both of her friends' bodies were located and extracted from the debris. During the fire, Lieutenant Azevedo was assigning overtime for scene security and Plaintiff asked him if she could work the overtime since she was already there. Lieutenant Azevedo refused to let Plaintiff work any overtime and he again stated he was not going to reward Plaintiff for something she did not earn.

48. After her friends' tragic deaths, Plaintiff was given permission by the Chief to attend the funeral services. Lieutenant Azevedo told Plaintiff he did not care if she had permission from the Chief, she was not going to attend the funerals because she needed to work and get back to "business as usual." Lieutenant Azevedo also told Plaintiff that her friends (the Fire Fighters) were already dead so she needed to get over it because it was "rubbing him the wrong way."

49. When it came time for the day of the actual funeral services, Lieutenant Azevedo again told Plaintiff she was not going to go into the church and she needed to be at her post

working traffic control. Even though there was plenty of coverage and Plaintiff was not needed on traffic control, Lieutenant Azevedo still refused to let her go to the funeral services.

50. After getting permission from Sergeant Ward who had to override Lieutenant Azevedo's decision, Plaintiff was able to attend part of the memorial services. The entire time she was in the church, Lieutenant Azevedo was having Sergeant Ward call Plaintiff and text her to tell me her she needed to get back to her traffic assignment. Plaintiff had to walk out in the middle of the memorial services and was never able to get closure.

51. In April 2020, Plaintiff dislocated her shoulder and tore her bicep at work during a fight with a combative subject. She worked with this injury for over a month before seeing a doctor because she knew she'd be retaliated against for getting injured. After seeing a doctor and confirming her injury, the doctor placed Plaintiff on restrictions and PPD refused to accommodate Plaintiff with light duty. After returning to work, Plaintiff's direct team was being sent to the riots in San Francisco. Plaintiff was excluded from going and when she asked Lieutenant Azevedo and Lieutenant Nix why she was not being sent, they told her they were not going to reward Plaintiff for being hurt. Plaintiff stayed behind and instead of working her specialty assignment, they made her work patrol as a punishment for being injured and in retaliation for opposing and reporting the sex harassment to which the newer and younger female officers were being subjected.

52. When Covid 19 first started, the City of Porterville placed officers on a "Covid schedule." Some officers were placed on call, while others worked for a premium wage. On May 14, 2020, Plaintiff was not on call until 2200 hours. Lieutenant Azevedo had Sergeant Martinez call Plaintiff in at 2100 hours. Plaintiff informed dispatch that she was not on call until 2200 hours so she could not respond until then because she was baby-sitting. Dispatch informed Plaintiff that Lieutenant Azevedo was not taking no for an answer and she needed to respond ASAP. There were two other male officers on call that night and both of them lived in town, but neither of them were called in. After Plaintiff arrived at the police department, she quickly realized she was not needed and she was called in as part of the ongoing campaign of retaliation

to which she was being subjected retaliation. Plaintiff was later told that Lieutenant Azevedo was trying to see if Plaintiff would fail to respond so he could reprimand her. Plaintiff was also informed by Sergeant Martinez and Sergeant Ward that Lieutenant Azevedo was in fact targeting her.

53. A similar incident happened the next weekend. Plaintiff worked all night. She was on her day off when Sergeant Ward gave her a courtesy call to let her know that she needed to respond to the shooting range. Sergeant Ward said he received a phone call from Lieutenant Nix and Lieutenant Azevedo and they intended to reprimand her if she did not go to range training that day. Plaintiff had not been informed prior to Sergeant Ward's call that she needed to attend range training that day, but Sergeant Ward informed her both Lieutenants called him and specifically requested he let them know if she failed to attend.

54. In June 2020, Lieutenant Azevedo told Plaintiff she was getting too old for this "game" and she should consider resigning from SWAT since she's "always" getting hurt. Lieutenant Azevedo also hinted that Plaintiff "burned bridges" at the police department so the chances of me promoting were slim to none because she had "pissed people off."

### Captain Jake Castellow

55. After Plaintiff reported the sexual harassment to which newer, younger female Officers were being subjected, Captain Jake Castellow, who had originally been supportive of Plaintiff, orchestrated the campaign of retaliation that forced Plaintiff to resign. He was the one who instructed Lieutenant Standridge to give Plaintiff her only negative performance appraisal. He also permitted and encourage Lieutenant Standridge, Lieutenant Azevedo and Sergeant Miller to harass Plaintiff, to humiliate her, criticize her unjustifiably, and dress her down and yell at her in front of her colleagues.

### Final Act of Discrimination and Retaliation

56. After enduring months of abusive conduct, being yelled at, dressed down in front of other officers, and constantly being unjustifiably criticized, Plaintiff was ordered to take a physical diagnostic test despite being injured and providing a doctor's note advising that she

14

PLAINTIFF'S SECOND AMENDED COMPLAINT & JURY DEMAND

should not take the test. Other similarly situated male officers were not being required to take the test at that time, but Plaintiff was not allowed to wait and take the test when they did so, which would have given her time to recover from her injury. This was the final straw in a campaign of retaliation intended to force Plaintiff to quit. Plaintiff had been having nightmares and anxiety caused by the discrimination and retaliation describe above, including the treatment Plaintiff received in February, 2020 after the deaths of my two Fire Fighter close friends. She simply could no longer work for a police department that did not care about her or her health and refused to address the discrimination and retaliation to which she and other female offers were being subjected. She could no longer continue to be bullied, discriminated against or retaliated against. This all took an emotional toll on her.  In light of the longstanding and ongoing failure of the Porterville Police Department's to investigate and remedy female officers' complaints of sexual harassment and to protect its female employees from the ongoing culture of discrimination and retaliation for opposing and reporting sexual harassment, as well as in the best interest of her sanity, her emotional health and her marriage, Plaintiff concluded that she had to resign.  Her last paid day at the Porterville Police Department was July 18, 2020.

**FIRST CAUSE OF ACTION:**
**SEX DISCRIMINATION IN VIOLATION OF TITLE VII**
**(Against Defendant City of Porterville)**

57. Plaintiff incorporates herein the allegations set forth above.

58. Title VII of the Civil Rights Act of 1964, 42 United States Code, section 2000e, *et seq.,* prohibits discrimination on the basis of a person's sex and/or sexual orientation.

59. As more fully described above, Defendant City of Porterville discriminated against Plaintiff based on her sex and her sexual orientation and subjected her to a hostile work environment that ultimately resulted in her constructive discharge.

60. As a result of Defendant City of Porterville's violations of the Title VII, Plaintiff has suffered, and will continue to suffer, damages, including, but not limited to, loss of income, loss of enjoyment of life, emotional distress, and damage to her health and personal and professional reputations.

## SECOND CAUSE OF ACTION:
## RETALIATION IN VIOLATION OF TITLE VII
**(Against Defendant City of Porterville)**

61. Plaintiff incorporates herein the allegations set forth above.

62. Title VII of the Civil Rights Act of 1964, 42 United States Code, section 2000e, *et seq.*, prohibits retaliation against an employee who opposes or reports sex discrimination.

63. As described more fully above, Defendant City of Porterville retaliated against Plaintiff for opposing and reporting the sex harassment to which she and other female officers were being subjected by subjecting her to a hostile work environment that ultimately resulted in her constructive discharge.

64. As a result of Defendant City of Porterville's violations of the Title VII, Plaintiff has suffered, and will continue to suffer, damages, including, but not limited to, loss of income, loss of enjoyment of life, emotional distress, and damage to her health and personal and professional reputations.

## THIRD CAUSE OF ACTION:
## SEX HARASSMENT IN VIOLATION OF THE FEHA
**(Against Defendants Benas, Miller, Azevedo and the City of Porterville)**

65. Plaintiff incorporates herein the allegations set forth above.

66. California's Fair Employment and Housing Act ("FEHA"), California Government Code Section 12900, *et. seq.*, prohibits sexual harassment.

67. As more fully described above, Defendants Benas, Miller and Azevedo sexually harassed Plaintiff in violation of the FEHA and the City of Porterville is strictly liable for their conduct because they were supervisors during periods they sexually harassed Plaintiff and because the City of Porterville was aware of their sexual harassment of Plaintiff and failed to take appropriate steps to investigate and remedy their sexual harassment of Plaintiff..

68. As a result of Defendants Benas, Miller, Azevedo and the City of Porterville's violations of the FEHA, Plaintiff has suffered, and will continue to suffer, damages, including, but not limited to, loss of income, loss of enjoyment of life, emotional distress, and damage to her health and personal and professional reputations.

**FOURTH CAUSE OF ACTION:
SEX DISCRIMINATION IN VIOLATION OF THE FEHA
(Against Defendant City of Porterville)**

69. Plaintiff incorporates herein the allegations set forth above.

70. California's Fair Employment and Housing Act ("FEHA"), California Government Code Section 12900, *et. seq.*, prohibits discrimination on the basis of a person's sex and/or sexual orientation.

71. As more fully described above, Defendant City of Porterville discriminated against Plaintiff based on her sex and her sexual orientation and subjected her to a hostile work environment that ultimately resulted in her constructive discharge.

72. As a result of Defendant City of Porterville's violations of the FEHA, Plaintiff has suffered, and will continue to suffer, damages, including, but not limited to, loss of income, loss of enjoyment of life, emotional distress, and damage to her health and personal and professional reputations.

**FIFTH CAUSE OF ACTION:
RETALIATION IN VIOLATION OF THE FEHA
(Against Defendant City of Porterville)**

73. Plaintiff incorporates herein the allegations set forth above.

74. California's Fair Employment and Housing Act ("FEHA"), California Government Code Section 12900, *et. seq.*, prohibits retaliation against an employee who opposes or reports discrimination on the basis of a person's sex and/or sexual orientation.

75. As more fully described above, Defendant City of Porterville retaliated against Plaintiff because she opposed and reported the discrimination and harassment to which she and her female co-workers were being subjected by subjecting her to a hostile work environment that ultimately resulted in her constructive discharge.

76. As a result of Defendant City of Porterville's violations of the FEHA, Plaintiff has suffered, and will continue to suffer, damages, including, but not limited to, loss of income, loss of enjoyment of life, emotional distress, and damage to her health and personal and professional reputations.

# SIXTH CAUSE OF ACTION:
# FAILURE TO TAKE APPROPRIATE CORRECTIVE
# ACTION TO PREVENT AND REMEDY THE SEXUAL HARASSMENT
# TO WHICH PLAINTIFF WAS SUBJECTED IN VIOLATION OF THE FEHA
## (Against Defendant City of Porterville)

77. Plaintiff incorporates herein the allegations set forth above.

78. California's Fair Employment and Housing Act ("FEHA"), California Government Code Section 12940(k) makes it unlawful for "an employer . . . to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring." As outlined above, Defendant City of Porterville to meet this requirement.

79. California's Fair Employment and Housing Act ("FEHA"), California Government Code Section also requires employers to "take immediate and appropriate corrective action" if its agents or supervisors, knows or should have known of an employee being sexually harassed and "fails to take immediate and appropriate corrective action." As outlined above, Plaintiff reported and complained about the sexual harassment to which she and other female employees were being subjected and Defendant City of Porterville failed to take "immediate and appropriate corrective action."

80. As a result of Defendant City of Porterville's violations of the FEHA, Plaintiff has suffered, and will continue to suffer, damages, including, but not limited to, loss of income, loss of enjoyment of life, emotional distress, and damage to her health and personal and professional reputations.

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

A. For lost compensation and related employment benefits, past and future, according to proof;

B. For special damages according to proof;

C. For compensatory damages for mental and emotional distress;

D. For reasonable costs and attorney's fees;

E. For prejudgment interest from the date of Plaintiff's discharge;

F. An injunction requiring the City of Porterville to offer Plaintiff a position for which she is qualified and to which she would have been promoted but for the discrimination and retaliation to which she was subjected;

G. An injunction requiring the City of Porterville to revise its policies and practices to eliminate the hostile and discriminatory culture at the Porterville Police Department and to institute a fair and non-discriminatory promotion process;

H. The appointment Special Master or Monitor to ensure the City of Porterville carries out the orders of this Court;

I. For such other and further relief that the Court may deem just and proper.

Dated: November 10, 2021         Respectfully submitted,

LAW OFFICES OF LAWRENCE J. KING

By: __/S/_____
     Lawrence J. King